UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------X

UNITED STATES OF AMERICA          :

    v.                            :          CRIMINAL NO. 01-40001-NMG

CHRISTOPHER ALBERT                :

------------------------------------------------------X

## DEFENDANT'S SENTENCING MEMORANDUM

### I.    Introduction

Defendant, Christopher Albert, has plead guilty to one count of possession of child

pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2), one count of

distribution of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and 2252A(b)(1),

and one count of interstate transmission of child pornography in violation of 18 U.S.C. §

2252A(a)(1).  According to the plea agreement, and as reflected in the Presentence Report

prepared in this case by the United States District Court Probation Office, defendant's total

adjusted offense level is twenty-nine.[1]  The United States District Court Probation Office has

---

[1]       (1) Per U.S.S.G. § 2G2.2(a), the applicable base offense level is seventeen;
(2) Per U.S.S.G. § 2G2.2(b)(1), there is a two level increase, to nineteen, because
the material in the instant offense involved a prepubescent minor;
(3) Per U.S.S.G. § 2G2.2(b)(2)(E), there is a two level increase to twenty-one,
because defendant's distribution of child pornography was other than that set
forth in U.S.S.G. § 2G2.2(b)(2)(A)-(D);
(4) Per U.S.S.G. § 2G2.2(b)(3), there is a four level increase to twenty-five,
because the material in the instant offense portrayed sadistic or masochistic
conduct or other depictions of violence;
(5) Per U.S.S.G. § 2G2.2(b)(4), there is a five level increase to thirty, because
defendant engaged in a pattern of activity involving sexual abuse or exploitation
of a minor;
(6) Per U.S.S.G. § 2G2.2(b)(5), there is a two level increase to thirty-two,
because defendant utilized a computer for transmitting the material in the instant

further determined, and defendant concurs, that he falls within Criminal History Category III

based on a six point criminal history score.[2]  While the Sentencing Table, U.S.S.G. § 5A,

provides for a sentencing range of 108 to 135 months if a defendant's offense level is 29 and

criminal history category is III, as provided in the plea agreement, ¶ 4(a), the government and

defendant have agreed to recommend to this Court a sentence of incarceration of 120 months.

---

offense;

(7) Per U.S.S.G. § 3E1.1, there is a three level decrease from his adjusted offense level to twenty-nine, because defendant has fully accepted responsibility for the offenses to which he is pleading guilty.

[2]    (1) Per U.S.S.G. § 4A1.2(e)(3), there is a score of zero criminal history points, resulting from defendant's conviction on March 8, 1981, Leominster District Court Docket No. 8390-1, of assault and battery, which was apparently dismissed after court costs were satisfied;

(2)  Per U.S.S.G. §§ 4A1.1(c) and 4A1.2(e)(2), there is a score of one criminal history point, resulting from defendant's conviction on September 13, 1995, Gardner District Court Docket No. 9563CR0662A, of three counts of indecent assault and battery on a child under 14, for which he was placed on probation until September 8, 1997;

(3)  Per U.S.S.G. §§ 4A1.1(c) and 4A1.2(e)(2), there is a score of one criminal history point, resulting from defendant's conviction on March 9, 1996, Leominster District Court Docket No. 9661CR0041, of dissemination of pornographic material to minors, indecent exposure, and contributing to the delinquency of a minor, for which he was placed on probation until May 8, 1998;

 (4)  Per U.S.S.G. §§ 4A1.1(b), 4A1.2(e)(2), and 4A1.2(k), there is a score of two criminal history points, resulting from defendant's conviction on January 14, 1999, Leominster District Court Docket No. 9861CR1605A&B, of two counts of contributing to the delinquency of a child, for which he received a one year split sentence, thirty days to serve and the balance suspended until January 12, 2001;

(5)  Per U.S.S.G. § 4A1.1(d), an additional two criminal history points are added to defendant's subtotal criminal history score of four because the instant offense was committed while he was under the criminal justice sentences imposed above.

2

The plea agreement further states that the government and defendant have agreed that there is no basis for a departure from the sentencing range established by the United States Sentencing Guidelines and neither party will seek a departure on any ground.  Defendant therefore submits this sentencing memorandum to bring to the Court's attention, and aid it in considering, factors relevant to the nature, extent, and place of service of the determined sentence, and to support defendant's plea to this Court to recommend to the Bureau of Prisons that he be designated to be confined to the Federal Correctional Institution at Butner, North Carolina, where the Sex Offender Treatment Program is housed.  See 18 U.S.C. § 3661("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); United States v. Wilkerson, 183 F.Supp. 2d 373 (D. Mass. 2002); United States v. Ribot, 97 F. Supp. 2d 74 (D. Mass. 1999).

## II.    Factors Relevant to the Nature, Extent and Place of Service of Sentence

### 1.    Susceptibility to Abuse

All inmates fear assault while incarcerated, but none as much as a person convicted of a sexual offense.  Defendants convicted of sexual crimes involving minors are arguably at the bottom of the crime ladder in the Bureau of Prisons and uniquely vulnerable to abuse.[3]  While

---

[3]    In United States v. Wilke, 156 F.3d 749, 751 (1998), the district court heard testimony from a defense witness who had been incarcerated in federal institutions for drug-related offenses.  The witness testified that an inmate convicted of sexual crimes involving a minor is the lowest thing in any criminal mind, that any inmate who harmed a sex offender would be considered a hero, and that inmates would do whatever they could to make sure a sex offender did not get out of prison.  The witness further offered that a person such as defendant, who had plead guilty to one count of violating 18 U.S.C. § 2242(a)(1) prohibiting the

3

defendant recognizes that he is not eligible for any sort of departure, including a departure based on extraordinary vulnerability to abuse in prison, see United States v. Ribot, 97 F. Supp. 2d 74 (D. Mass 1999), Koon v. United States, 518 U.S. 81 (1996), defendant submits that this Court should consider the fact that he is a member of a particular class of offenders uniquely susceptible to abuse in prison, in determining the appropriate nature, extent and place to serve the sentence this Court imposes. "If inmates who committed sexual crimes involving minors are uniquely vulnerable to abuse, then an appropriate response is for the BOP to protect them from the general population or to remove them from the general population and place them in facilities like the BOP's Butner, North Carolina, facility where the Sex Offender Treatment Program is housed. In other words, if abuse in prison is a problem for an entire class of offenders, then the remedy is to alter their conditions of confinement." United States v. Wilke, 156 F.3d 749, 754 n.1 (1998).

Throughout the entire period that defendant has been incarcerated awaiting trial and / or sentencing in this case, he has never received any documents relevant to his case by mail because of his real and overwhelming fear of being severely abused due to his status as a sex offender. Hopefully, defendant will never be attacked by fellow inmates and / or staff, however he will undoubtedly have more reason to fear for his safety and will suffer more mental anguish while imprisoned than a typical prisoner. Because of his exposure to attack, defendant may also be required to serve his sentence in the harsh conditions of administrative lockdown, rather than in a more open area of the prison. Administrative Detention is a form of separation from the general population used "when the continued presence of the inmate within the general

---

transportation of child pornography, would be abused, raped, and turned into a sex slave.

4

population would pose a serious threat to life, property, self, staff or other inmates, or to the security or orderly running of the institution." Placement in lockdown is the typical Bureau of Prisons response to an inmate's need for protection. BOP Program Statement 5270.07 (Exh. A, Chapter 9, page 5-6).

For these reasons, defendant respectfully requests this Court to accept the plea agreement with respect to the agreed upon term of incarceration of 120 months, and further, to recommend to the Bureau of Prisons that he be designated to be confined to the Federal Correctional Institution at Butner, North Carolina where the Sex Offender Treatment Program is housed.

### 2.    Mental and Emotional Capacity

Defendant has agreed by virtue of his plea that he will not seek a departure based on "diminished capacity", pursuant to U.S.S.G. § 5K2.13, which provides for a sentence below the applicable guideline range if the defendant committed a non-violent offense "while suffering from a significantly reduced mental capacity." However, as 18 U.S.C. § 3553(a)(1) directs the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant" in determining the particular sentence to be imposed, defendant submits that the following facts regarding his mental and emotional capacity may aid this court in imposing an appropriate sentence.

"Significantly reduced mental capacity" has been defined in the Application Note following U.S.S.G. § 5K2.13 as "a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offence or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." In other words, "[t]he first prong permits sentencing courts to consider defects of cognition. The second prong permits sentencing

5

courts to consider defects of volition." United States v. McBroom, 124 F.3d 533, 548 (3rd Cir.

1998). United States v. Iaconetti, 59 F. Supp. 2d 139, 146 (D. Mass. 1999)("diminished capacity

departure is not limited to a defendant who is unable to reason, or process information in the

usual way. It includes a defendant who is unable to control his conduct, even if his cognitive

abilities are unimpaired."); United States v. Cantu, 12 F.3d 1506, 1512 (9th Cir. 1993)("reduced

mental capacity" refers not only to a lack of full intellectual functioning, but also emotional

conditions as well, including mood disorders"); United States v. Poff, 926 F.2d 588, 595 (7th

Cir.) cert. denied, 502 U.S. 827 (1991)(Easterbrook, J., dissenting)("We have treated U.S.S.G. §

5K2.13 as applying to emotional conditions as well [as lack of intellectual functioning] . . .

Treating emotional illness in the same way that we do mental abnormalities furthers the purpose

of U.S.S.G. § 5K2.13. The role of the guideline is lenity toward defendants whose ability to

make reasoned decisions is impaired. Emotional conditions, like mental impairments may

distort or suppress the formation of reasoned decisions.").

     In addition, the guideline mandates that a court find that the "significantly reduced

mental capacity. . . contributed," at least to some degree, "to the commission of the offense."

This does not, however, require that the condition be the but-for or sole cause of the offense.

United States v. Shore, 143 F. Supp. 2d 74, 80 (D. Mass. 2001); accord United States v.

McBroom, supra, 124 F.3d at 548 n. 14, United States v. Cantu, supra, 12 F.3d at 1515

("Although the issue has never arisen in our circuit, other circuits are unanimous in holding that

the disorder need be only a contributing cause, not a but-for cause or a sole cause, of the

offense," (citing, among other cases, United States v. Soliman, 954 F.2d 1012, 1014 (5th Cir.

1992); United States v. Lauzon, 938 F.2d 326, 331 (1st Cir. 1991))).

In determining whether the "diminished capacity" standard applies, federal district courts in Massachusetts have held that

> the standard does not require a finding that the defendant's impairment is somehow extraordinary, unique, or outside of the heartland, as those terms have been understood elsewhere in the Guidelines. Rather, the standard focuses only on the case at hand, unlike the departures in Chapter 5H, which involve comparisons with other defendants. Had the Commission intended to require a broader inquiry, it would have indicated that 'diminished capacity' is 'not ordinarily relevant' – suggesting that the facts must be 'extraordinary' to justify departure – as it did in discussing educational and vocational skills, § 5H1.2, physical conditions, § 5H1.4, and employment record, § 5H1.5.

United States v. Shore, supra, 143 F. Supp. 2d at 80. See also United States v. Fulton, 960 F. Supp. 479, 497 (D. Mass. 1997)(court found that the defendant "suffered from diminished mental capacity deriving from vulnerability traceable in part to childhood abuse and in part to more recent traumatic experiences"but did not make any finding that defendant's mental incapacity was in any way "unique" or "extraordinary.")

In the case at bar, defendant's mental and emotional capacities plainly evidence both cognitive and volitional impairments. As detailed in the various psychological evaluations of defendant submitted with the Presentence Report prepared by Probation, defendant has been perpetually hamstrung by his borderline intellectual functioning and failure to psychosexually mature. For instance, the results of his evaluation by New England Forensic Associates revealed in May, 2000, that defendant

> was a somewhat limited man who, over the course of his life, was rejected and ridiculed by his peers because of his clumsiness and borderline intellectual functioning. Furthermore, he seemed to have felt isolated within his own family. This left him with a pervasive experience of isolation and loneliness by the time he entered junior high school. In an attempt to cope with this and receive acceptance among his peers, who often teased and tormented him, it is likely that he developed a compliant and self-defeating personality style.

7

It is also likely that this style left him more vulnerable, compared to his peers, to being sexually assaulted by his organ teacher at 12 years of age. During this time, the level of intimacy provided by this organ teacher may have been very strong compared to other relationships, leaving [defendant] with a deviant sense of attachment. Because of this experience, his ability to sexually develop as a n adult was seriously compromised. ***

[Defendant] understands that he is extremely lonely. In an attempt to cope with this loneliness, he seeks people who he thinks will visit him and engage in very close physical contact. His history of deviancy included attempts to seduce children into wearing tight and revealing clothing and to engage in close physical contact (massages). However, he emphatically believes he has no sexual interest at these times. He states that he just wants closeness and holding. Because he has not psychosexually matured, he can only do this with adolescents. His dependency on masturbation as a maladaptive coping method was suggested by his use of pornography and in his report that he masturbated to the thought of massaging boys. At times, he became sexually compulsive and overrode judgment, even with the fear of punishment.

While not excusing his behavior entirely, defendant's history clearly illustrates the detrimental impact that limited cognitive and emotional capacities have had on his life. Whether traceable to his upbringing, (his brother and sister too suffer from alcoholism and mental illness respectively), the sexual abuse he suffered at the hands of a trusted teacher that his parents seemed unwilling or unable to address, or something in defendant's organic makeup, these facts illuminate defendant's need for comprehensive treatment to address his emotional immaturity and social and intellectual deficiencies. Surely, defendant's seeming absence of volitional control in the past, having re-offended almost immediately after treatment and probation was terminated in 1998 and having re-offended while participating in treatment and while on probation in 2000, calls into question his cognitive ability to make reasoned decisions and is indicative of a significantly reduced mental capacity as contemplated in U.S.S.G. § 5K2.13.

For all of these reasons, defendant respectfully requests this Court consider these deficits in his mental and emotional capacities in determining the nature, extent and place that defendant

8

will serve his sentence.

### 3.    Need for Treatment

In conclusion, defendant submits that there is little doubt that treatment is necessary to address his comprehensive treatment and medication needs. Previously, defendant made several attempts at treatment as an adult after it was mandated as a condition of probation. In January 1996, defendant began treatment at Wachusett Counseling Associates, ("WCA"), where he participated in weekly group therapy with Joseph Rak. Defendant faithfully attended his treatment sessions at WCA, but experienced them as ineffective – unable to confront the problems he had in the confines of the group therapy available there. Defendant continued to participate in treatment at WCA until May 1998, when his probation and mandated treatment was terminated. Almost immediately thereafter, in June 1998, defendant relapsed.

In September 1998, defendant re-engaged in therapy with New England Forensic Associates, ("NEFA"), after being court referred for evaluation and development of a treatment plan. One of his therapists at NEFA, Ruth E. Lewis, Ph.D., concluded that defendant did not benefit from the usual sort of offender group treatment, such as he received at WCA, considering that he relapsed within such a short period of time following termination of his treatment there. Dr. Lewis believed that a combination of defendant's personality characteristics, his below average intelligence, and his sense of isolation kept him from openly confronting the problems he had. Dr. Lewis recognized that defendant's treatment needs were more complicated and required behavior therapy to bring his deviant interests under control as well as to help him develop a greater comfort with peer relationships. According to defendant's treatment records at NEFA, he participated actively and consistently with Dr. Lewis in individual cognitive

behavioral psychotherapy through May 1, 2000. Clearly, defendant requires additional sex offender treatment in order to assist him in conforming his conduct to the law once he is returned to the community. It is arguably in everyone's best interest to provide defendant with the opportunity to begin sex offender treatment now, rather than in ten years when the plea agreement provides for five years of supervised release with special conditions including intensive sex offender treatment in conjunction with polygraph testing.

For all of these reasons, defendant respectfully requests this Court sentence him to the agreed upon term of incarceration of 120 months and recommend to the Bureau of Prisons that he be designated to be confined to the Federal Correctional Institution at Butner, North Carolina where the Sex Offender Treatment Program is housed.

Dated: January 31, 2003

Respectfully submitted,
By His Attorney:

John G. Swomley, BBO# 551450
Swomley & Associates
83 Atlantic Avenue
Boston, MA 02110
Tel. 617-227-9443

## CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/by hand.

Date: 1/31/03 _____
            Signature

10

Exhibit a

PS5270.07 INMATE DISCIPLINE & SPECIAL HOUSING UNITS



U.S. Department of Justice
Federal Bureau of Prisons

CORRECTED COPY 10/13/2000

# Change Notice

**DIRECTIVE AFFECTED:** 5270.07
**CHANGE NOTICE NUMBER:** 12
**DATE:** 10/11/2000

**RULES EFFECTIVE:** 11/6/2000

1. **PURPOSE AND SCOPE.** To update Program Statement 5270.07, **Inmate Discipline and Special Housing Units**.

2. **SUMMARY OF CHANGES.** This Change Notice directs the creation of a Greatest Severity Level prohibited act (100 level offense code) for use of the telephone to further any criminal activity, the creation of a High Severity Level prohibited act (200 level offense code) for non-criminal telephone abuses, the creation of a Moderate Severity Level prohibited act (300 level offense code) for non-criminal telephone abuses, and the creation of a Low Moderate prohibited act (400 level offense code) for non-criminal telephone abuses.

Additionally, the Low Moderate Severity Level (400 level Offense code) for Unauthorized Use of the Mail or Telephone has been revised to only apply to mail abuses and the smoking violations are elevated from a Low Moderate Severity Level (400 level offense code) to a Moderate Severity Level prohibited act (300 level offense code).

Other changes are:

   a.  Establish a new Prohibited Act Offense Code 197 on the list of prohibited acts found under the Greatest Category;

   b.  Establish a new Prohibited Act Offense Code 297 on the list of prohibited acts found under the High Category;

   c.  Establish a new Prohibited Act Offense Code 397 on the list of prohibited acts found under the Moderate Category;

   d.  Abolish the Prohibited Act Offense Code 403 and establish the Prohibited Act Offense Code 332 on the list of prohibited acts found under the Moderate Category; and

PS 5270.07

e.  Establish a new Prohibited Act Offense Code 497 on the list
of prohibited acts found under the Low Moderate Category and remove
the reference to telephone from the Prohibited Act Offense Code 406
to only apply to mail offenses.

3.  **TABLE OF CHANGES**

| Remove | Insert |
|---|---|
| Chapter 4, Pages 3 thru 14 | Chapter 4, Pages 3 thru 14 |

4.  **ACTION**.  File this Change Notice in front of PS 5270.07, **Inmate
Discipline and Special Housing Units**.


                                    /s/
                              Kathleen Hawk Sawyer
                              Director

## CHAPTER 9
## SPECIAL HOUSING UNITS

Each institution having the need for facilities to house inmates separate from the general population will establish a special housing unit consisting of two categories of cells:  administrative detention and disciplinary segregation.  (<u>Note</u>:  Some institutions may also have a facility for long-term control unit programs - see Control Unit Programs Program Statement.)

*  **Staff must limit the access between female and male inmates housed in Special Housing Units.**  Female and male inmates are not to be assigned to cells on the same range, assigned as orderlies on opposite gender ranges or to work together in common areas, assigned to exercise groups with opposite gender inmates, etc.
A physical separation between female and male inmates must be continually maintained except in an emergency.                                                      *

<u>Disciplinary Segregation Status</u>.  A form of separation from the general population in which inmates who commit serious violations of Bureau rules are confined by the Discipline Hearing Officer, for specified periods of time, in a cell removed from the general population.  The DHO imposes the sanction of disciplinary segregation only upon determining that no other available disposition will adequately achieve the purpose of punishment and deterrence necessary to regulate an inmate's behavior within acceptable limits.

<u>Administrative Detention Status</u>.  A form of separation from the general population used when the continued presence of the inmate within the general population would pose a serious threat to life, property, self, staff or other inmates, or to the security or orderly running of the institution.  This housing status may also include inmates who require protective custody, those who cannot be placed in local population because they are en route to another institution (holdovers), and those who are awaiting a hearing before the Unit Discipline Committee or Discipline Hearing Officer.  Administrative detention status is a non-punitive status in which restricted conditions of confinement are required only to ensure the safety of inmates or others, the protection of property, or the security or orderly running of the institution.

Special Housing Units will be maintained in accordance with the policies and procedures contained in this Program Statement.  Placement of Youth Corrections Act or Pretrial inmates in Special Housing Units is governed by the Youth Corrections Act (YCA) Institutions and Programs Program Statement and the Pretrial Inmates Program Statement.  See Chapter 10 for a sample of the Special Housing Unit Record.

DISCIPLINARY SEGREGATION

1.  [JUSTIFICATION FOR PLACEMENT IN DISCIPLINARY SEGREGATION AND REVIEW OF INMATES IN DISCIPLINARY SEGREGATION §541.20

    a.  Except as provided in paragraph (b) of this section, an inmate may be placed in disciplinary segregation only by order of the Discipline Hearing Officer following a hearing in which the inmate has been found to have committed a prohibited act in the Greatest, High, or Moderate Category, or a repeated offense in the Low Moderate Category.  The DHO may order placement in disciplinary segregation only when other available dispositions are inadequate to achieve the purpose of punishment and deterrence necessary to regulate an inmate's behavior within acceptable limits.

    b.  The Warden may temporarily (not exceeding five days) move an inmate to a more secure cell (which may be in an area ordinarily set aside for disciplinary segregation and which therefore requires the withdrawal of privileges ordinarily afforded in administrative detention status, until a hearing before the DHO can be held) who:

        (1)  is causing a serious disruption (threatening life, serious bodily harm, or property) in administrative detention,

        (2)  cannot be controlled within the physical confines of administrative detention, and

        (3)  upon advice of appropriate medical staff, does not require confinement in the institution hospital for mental or physical treatment, or who would ordinarily be housed in the institution hospital for mental or physical treatment, but who cannot safely be housed there because the hospital does not have a room or cell with adequate security provisions.

    The Warden may delegate this authority no further than to the official in charge of the institution at the time the move is necessary.]

    A fully documented report (Temporary Placement in Disciplinary Segregation Order - see Chapter 10) shall be immediately forwarded to the Inmate Central File.

likely to destroy clothing or bedding or create a disturbance which would be seriously detrimental to others, the Medical Department shall be notified immediately and a regimen of treatment and control instituted with the concurrence of the Medical Officer, in consultation with mental health staff.

P.S. 5270.07
December 29, 1987
Chapter 9, Page 4

[Inmates in special housing status will be provided, as nearly as
practicable, the same opportunity for the issue and exchange of clothing,
bedding, and linen, and for laundry as inmates in the general population.
Exceptions to this procedure may be permitted only when found necessary by
the Warden or designee.  Any exception, and the reasons for this, must be
recorded in the unit log.]

Any exception should also be documented on the reverse side of the
BP-292(52) (Chapter 10, page 13).

   [(4)  **Food.**  Staff shall give a segregated inmate nutritionally adequate
meals, ordinarily from the menu of the day for the institution.  Staff may
dispense disposable utensils when necessary.]

See Food Service Manual (P.S. 4700.2) for standards and guidelines for
feeding in Special Housing Units.

   [(5)  **Personal Hygiene.**  Segregated inmates shall have the opportunity to
maintain an acceptable level of personal hygiene.  Staff shall provide
toilet tissue, wash basin, tooth brush, eyeglasses, shaving utensils, etc.,
as needed.  Staff may issue a retrievable kit of toilet articles.  Each
segregated inmate shall have the opportunity to shower and shave at least
three times a week, unless these procedures would present an undue security
hazard.  This security hazard will be documented and signed by the Warden,
indicating the Warden's review and approval.

Inmates in special housing will be provided, where practicable, barbering
and hair care services.  Exceptions to this procedure may be permitted only
when found necessary by the Warden or designee.

   (6)  **Exercise.**  Staff shall permit each segregated inmate no less than
five hours exercise each week.  Exercise should be provided in five
one-hour periods, on five different days, but if circumstances require,
one-half hour periods are acceptable if the five-hour minimum and different
days schedule is maintained.  These provisions must be carried out unless
compelling security or safety reasons dictate otherwise.  Institution staff
shall document these reasons.]

If weather and resources permit, the inmate shall receive outdoor exercise
periods.  Based on security considerations, weight training equipment is
not available to inmates in administrative detention and disciplinary
segregation status.

[Exercise periods, not to exceed one week, may be withheld from an inmate
by  order of the Warden, following a hearing, and recommendation, before a
person certified in the discipline hearing officer procedures.  This
hearing must be held in accordance with the provisions of §541.17,
following those provisions which are appropriate to these circumstances,  ..
and only upon a finding by the person conducting the hearing that the
actions of the segregated inmate pose a threat to the safety or health

**conditions of the unit.]**

Only a person certified to conduct DHO hearings may hold these hearings.

regulations must be followed by institution staff (see **Parts 540, 543, and 548 of this Chapter**).]

Part 540, Subpart B refers to P.S. 5265.8, Correspondence Regulations; Part 540, Subpart D refers to P.S. 5267.4, Visiting Regulations; Part 540, Subpart 1 refers to P.S. 5264.3, Telephone Regulations for Inmates; Part 543 refers to P.S. 1315.3, Inmate Legal Activities; Part 548 refers to P.S. 5360.5, Religious Belief and Practices of Committed Offenders.

## ADMINISTRATIVE DETENTION

1.    [ADMINISTRATIVE DETENTION §541.22.  Administrative detention is the status of confinement of an inmate in a special housing unit in a cell either by self or with other inmates which serves to remove the inmate from the general population.

    a.  Placement in Administrative Detention.  The Warden may delegate authority to place an inmate in administrative detention to Lieutenants. Prior to the inmate's placement in administrative detention, the Lieutenant is to review the available information and determine whether the inmate's placement in administrative detention is warranted.  The Warden may place an inmate in administrative detention when the inmate is in holdover status (i.e., en route to a designated institution) during transfer, or is a new commitment pending classification.  The Warden may also place an inmate in administrative detention when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution and when the inmate:

        (1)    Is pending a hearing for a violation of Bureau regulations;

        (2)    Is pending an investigation of a violation of Bureau regulations;

        (3)    Is pending investigation or trial for a criminal act;

        (4)    Is pending transfer;

        (5)    Requests admission to administrative detention for the inmate's own protection, or staff determines that admission to or continuation in administrative detention is necessary for the inmate's own protection (see §541.23); or

        (6)    Is terminating confinement in disciplinary segregation and placement in general population is not prudent.  The Segregation Review Official is to advise the inmate of this determination and reason for such action.]

The review must be separate from the initial hearing before the DHO which resulted in the inmate's placement in disciplinary segregation.

P.S. 5270.07
CN-07, September 4, 1996
Chapter 9, Page 7

\*        (a)    [(i)  **Except for pretrial inmates or inmates in a control unit program, staff ordinarily within 90 days of an inmate's placement in post-disciplinary detention shall either return the inmate to the general inmate population or request regional level assistance to effect a transfer to a more suitable institution.]**
                                                                           \*

On occasion, court requirements or similar constraints require an inmate's retention beyond 90 days (for example, the inmate cannot be transferred due to pending charges).  Whenever it is necessary to hold an inmate in post-disciplinary detention beyond 90 days, the Regional Director is to be notified.

Administrative type institutions are facilities to which inmates are assigned for factors other than security, e.g., mental health reasons, short term inmates, etc. (see the Program Statement on the Security Designation and Custody Classification System).  See the Program Statement on Pretrial Inmates, for procedures in regards to this category.

(i)  If an inmate is unable to be placed into the general population, the reason is documented and the case, with all relevant material, is referred to the appropriate Regional Director, Attention: Regional Correctional Services Administrator.  The Correctional Services Administrator will review the case with the Regional Designator, and a recommended placement will then be given to the Regional Director.

(ii)  All Central Inmate Monitoring Cases (CIM) cases will receive a CIM clearance before transfer, under the provisions of the current Program Statement on the Central Inmate Monitoring System.

(iii)  A Regional Director may order the transfer of post-disciplinary detention cases within that Region, or to other Regions with the concurrence of the receiving Regional Director.

(b)    [(ii)  **The Assistant Director, Correctional Programs Division, shall review for purpose of making a disposition, the case of an inmate not transferred from post-disciplinary detention within the time frame specified in paragraph (a) of this section.]**

Referrals to the Assistant Director are made only in the event that the appropriate Regional Director is unable to resolve the situation within the 90-day period.  When this occurs, a referral will be made within 10 days by the Regional Director to the Assistant Director.

P.S. 5270.07
CN-07, September 4, 1996
Chapter 9, Page 8

\*          (c)  [(iii)  **Staff in a control unit will attempt to adhere to
the 90-day limit for an inmate's placement in post-disciplinary detention.
Because security needs required for an inmate in a control unit program may
not be available outside of post-disciplinary detention, the Warden may
approve an extension of this placement upon determining in writing that it
is not practicable to release the inmate to the general inmate population
or to effect a transfer to a more suitable institution.]**

          (d)  [(iv)  **The appropriate Regional Director and the Assistant
Director, Correctional Programs Division, shall review (for purpose of
making a disposition) the case of an inmate in a control unit program not
transferred from post-disciplinary detention within the 90-day time frame
specified in paragraph (a)(6)(iii) of this section.  A similar, subsequent
review shall be conducted every 60-90 days if post-disciplinary detention
continues for this extended period.]**          \*

          The Executive Panel, composed of the appropriate Regional
Director and the Assistant Director, Correctional Programs Division, shall
review the status of an inmate who is in post-disciplinary detention status
over 90 days at the same time they review (every 60-90 days) the status of
inmates in the Control Unit (see the Program Statement on Control Unit
Programs).

          [b.  **Administrative Detention Order Detailing Reasons For Placement**.  **The
Warden shall prepare an administrative detention order detailing the
reasons for placing an inmate in administrative detention, with a copy
given to the inmate, provided institutional security is not compromised
thereby.  Staff shall deliver this order to the inmate within 24 hours of
the inmate's placement in administrative detention, unless this delivery is
precluded by exceptional circumstances.  An order is not necessary for an
inmate placed in administrative detention when this placement is a direct
result of the inmate's holdover status.]**

     Ordinarily the Warden will delegate authority for this placement action
to Lieutenants.

The order is also given to members of the inmate's unit or team.
Distribution of copies shall be as indicated on the order.  See Chapter 10
for a copy of the Administrative Detention Order.

[c. **Review of Inmates Housed in Administrative Detention**.

     (1) **Except as otherwise provided in paragraphs c(2) and c(3) of this
section, the Segregation Review Official will review the status of inmates
housed in administrative detention.**  The SRO shall conduct a record review
within three work days of the inmate's placement in administrative
detention and shall hold a hearing and formally review the status of each
inmate who spends seven continuous days in administrative detention, and
thereafter shall review these cases on the record (in the inmate's absence)
each week, and shall hold a hearing and review these cases formally at
least every 30 days.  The inmate appears before the SRO at the hearing
unless the inmate waives the right to appear.  A waiver may be in writing,
signed by the inmate, or if the inmate refuses to sign a waiver, it shall
be shown by a memorandum signed by staff and witnessed by a second staff
member indicating the inmate's refusal to appear at the hearing.

Staff shall conduct a psychiatric or psychological assessment, including a
personal interview, when administrative detention continues beyond 30 days.
The assessment, submitted to the SRO in a written report, shall address the
inmate's adjustment to surroundings and the threat the inmate poses to
self, staff and other inmates.  Staff shall conduct a similar psychiatric
or psychological assessment and report at subsequent one-month intervals
should detention continue for this extended period.  Administrative
detention is to be used only for short periods of time except where an
inmate needs long-term protection (see §541.23), or where there are
exceptional circumstances, ordinarily tied to security or complex
investigative concerns.  An inmate may be kept in administrative detention
for longer term protection only if the need for such protection is
documented by the SRO.  Provided institutional security is not compromised,
the inmate shall receive at each formal review a written copy of the SRO's
decision and the basis for this finding.  The SRO shall release an inmate
from administrative detention when reasons for placement cease to exist.]

P.S. 5270.07
December 29, 1987
Chapter 9, Page 9

*   Ordinarily, these status reviews will be conducted by the Captain, but the Warden may designate other staff such as the Operations Lieutenant of the Administrative Detention Unit or members of the inmate's unit or team to conduct this review.  Staff conducting these status reviews must be certified in inmate discipline matters.                                             *

The required reviews are to be recorded on the Special Housing Review form. Chapter 10 has a copy of both the Special Housing Review and the Waiver of Appearance forms.

    [(2)  **The Warden shall designate appropriate staff to meet weekly with an inmate in administrative detention when this placement is a direct result of the inmate's holdover status.  Staff shall also review this type of case on the record each week.]**

Staff are to place in the inmate central file documentation of the weekly personal staff contacts and of the record review.

    [(3) **When an inmate is placed in administrative detention for protection, but not at that inmate's request, the Warden or designee is to review the inmate's status within two work days of this placement to determine if continued protective custody is necessary.  A formal hearing is to be held within seven days of the inmate's placement (see §541.23, Protection Cases).]**

*    §541.23 is located on page 10 of this Chapter.  These reviews and hearings will be conducted by a staff member designated by the Warden, who may designate the DHO, Captain, or any other person with special knowledge in this area.  This person must be certified in discipline procedures.      *

    [d.  <u>Conditions of Administrative Detention.</u>  The basis level of conditions as described in §541.21(c) for disciplinary segregation also apply to administrative detention.  If consistent with available resources and the security needs of the unit, the Warden shall give an inmate housed in administrative detention the same general privileges given to inmates in the general population.  This includes, but is not limited to, providing an inmate with the opportunity for participation in an education program, library services, social services, counseling, religious guidance and recreation.  Unless there are compelling reasons to the contrary, institutions shall provide commissary privileges and reasonable amounts of personal property.  An inmate in administrative detention shall be permitted to have a radio, provided that the radio is equipped with ear plugs.  Exercise periods, at a minimum, will meet the level established for disciplinary segregation and will exceed this level where resources are available.  The Warden shall give an inmate in administrative detention visiting, telephone, and correspondence privileges in accordance with Part 540 of this Chapter.

The Warden may restrict for reasons of security, fire safety, or housekeeping the amount of personal property that an inmate may retain

**while in administrative detention.]**

The Appendix to this Chapter contains a listing of that personal property which is ordinarily allowed in Administrative Detention.  Part 540 refers to P.S. 5267.4, Visiting Regulations, P.S. 5264.3, Telephone Regulations for Inmates, and P.S. 5265.8, Correspondence.

P.S. 5270.07
December 29, 1987
Chapter 9, Page 10

(1)  It is suggested that each institution have a quantity of inexpensive ear plugs available to ensure that radio noise level is controlled.  Where a Warden believes that a radio will present a serious security problem in respect to contraband, the Warden may purchase individual radios, to remain in each cell.  Any damage or destruction to such radios would be grounds for disciplinary action.

(2)  If weather and resources permit, the inmate shall receive outdoor exercise periods.

(3)  Failure of an inmate to maintain acceptable living and sanitation standards may result in a disciplinary report (Code 317) being written and sanctions imposed.

2.  [PROTECTION CASES §541.23.

  a.  Staff may consider the following categories of inmates as protection cases:

    (1)  Victims of inmate assaults;
    (2)  Inmate informants;]

Inmates who have provided information to the institution staff or any law enforcement agency concerning criminal activities by others.

    [(3) Inmates who have received inmate pressure to participate in sexual activity;

    (4)  Inmates who seek protection through detention, claiming to be former law enforcement officers, informants, or others in sensitive law enforcement positions, whether or not there is official information to verify the claim;

    (5)  Inmates who have previously served as inmate gun guards, dog caretakers, or in similar positions in state or local correctional facilities;

    (6)  Inmates who refuse to enter the general population because of alleged pressures from other unidentified inmates;

    (7)  Inmates who will not provide, and as to whom staff cannot determine, the reason for refusal to return to the general population;

    (8)  Inmates about whom staff has good reason to believe the inmate is in serious danger of bodily harm.]

Inmates who request protection, or who agree with the need for separation for protection reasons, will so indicate on the form (Administrative Detention Order - see Chapter 10) documenting placement in administrative detention.

[b.  Inmates who are placed in administrative detention for protection, but not at their own request or beyond the time when they feel they need to be detained for their own protection, are entitled to a hearing, no later than seven days from the

time of their admission (or from the time of their detention beyond their
own consent).  This hearing is conducted in accordance with the procedural
requirements of §541.17, as to advance written notice, staff
representation, right to make a statement and present documentary evidence,
to request witnesses, to be present throughout the hearing, and advance
advisement of inmate rights at the hearing, and as to making a record of
the proceedings.]

This hearing may be conducted by a DHO, by the Captain, or by any other
person certified in inmate discipline procedures.  When practicable, the *
hearing is to be provided prior to the inmate's placement in administrative
detention.  When this is not practicable and an inmate is placed in
administrative detention for protection, but not at that inmate's own
request, the Warden or designee (ordinarily the Captain) shall review the
placement within two work days of the placement to determine if continued
protective custody is necessary.  If continued placement if warranted, the
formal hearing described above is to occur within seven days of the
inmate's placement.

[c.  Ordinarily, staff may place an inmate in administrative detention as
provided in paragraph (a) of this rule relating to protection cases, for a
period not to exceed 90 days.  Staff shall clearly document in the record
the reasons for any extension beyond this 90-day period.]

Inmates in Categories a(1-5) of this section (on protection cases) are not
to be extended beyond 90 days unless there are exceptional circumstances
and approval is obtained from the appropriate Regional Correctional
Services Administrator.  Inmates in Categories a(6, 7, and 8) may be
extended by the Warden provided there is a clear documentation of need, and
provided that the inmate is otherwise appropriately classified for that
facility.

[d.  Where appropriate, staff shall first attempt to place the inmate in
the general population of their particular facility. Where inappropriate,
staff shall clearly document the reason(s) and refer the case, with all
relevant material, to their Regional Director, who, upon review of the
material, may order the transfer of a protection case.]

The institution referral is directed to the attention of the Regional
Correctional Services Administrator.  This person will review the case with
the Regional Designator and a recommended placement will then be given to
the Regional Director.

All Central Inmate Monitoring Cases (CIM) cases will receive a CIM
clearance before transfer, under the provisions of P.S. 5180.2, Central
Inmate Monitoring System.

Transfer of a protection case does not require concurrence of the receiving
Regional Director.

P.S. 5270.07
December 29, 1987
Chapter 9, Appendix

PERSONAL PROPERTY ORDINARILY ALLOWED IN ADMINISTRATIVE DETENTION
(If not otherwise a threat to institution security)

1.   Bible, Koran, or other scriptures
2.   Books, Paperback
3.   Cigarettes
3.   Coffee
5.   Cups, Drinking
6.   Eye Glasses
7.   Fruits
8.   Legal Materials
9.   Magazines
10.  Magic Shave
11.  Mail
12.  Newspapers
13.  Personal Hygiene Items (except razors)[1]
14.  Photo Albums
15.  Authorized Religious Medals/Headgear (e.g., kufi)
16.  Shoes, Shower
17.  Shoes, Tennis (except those with steel shanks)
18.  Snack Foods
19.  Soft Drinks, Powdered
20.  Stationery/Stamps
21.  Sugar Cubes
22.  Tobacco, Chewing
23.  Tobacco, Smoking
24.  Wedding Band
25.  Radio with ear plugs
26.  Watch

In some instances, it will be necessary for the Chief Executive Officer to develop local limitations on the quantity and type of personal property allowed in administrative detention.  Personal property may be limited or withheld for reasons of security, fire safety, or housekeeping, documented in unit records.

[1] Razors shall be controlled by special housing unit staff.  Only disposable razors will be used.